CLEMENTE MORALES-ARCADIO, et al.,

    Plaintiffs,

v.          605CV062

SHANNON PRODUCE FARMS, INC. and JAMES
G. SHANNON, JR.,

    Defendants.

## ORDER

## I. INTRODUCTION

This case concerns the alleged underpayment of so-called "H-2A laborer" farmworkers (collectively "Laborers") by defendants Shannon Produce Farms, Inc., James Shannon, Sr., and James Shannon, Jr. (referred to collectively as the singular "Shannon"; referred to individually as "Shannon Farms," "Shannon, Sr." and "Shannon, Jr."). An H-2A laborer is "an alien ... having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

The Laborers' Second Amended Complaint contends that their 2000-2005 pay for services performed at Shannon's muscadine grape farm fell below both the minimum required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and the amounts promised in their annual employment contracts. Doc. # 84 at 20-23 (FLSA minimum wage claims), at 23-38 (breach of contract claims). The Complaint also sets forth conversion and fraud claims. *Id.* at 38-40 (conversion claim); at 40-45 (fraud claim).

Before the Court are the parties' cross-motions for partial summary judgment, doc. ## 128, 132, an objection to the Magistrate Judge's ("MJ's")

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2007 JUL 18 PM 2: 49

CLERK _____
SO. DIST. OF GA.

Order denying a motion to amend Shannon's Answer, doc. # 182, the Laborers' motion to strike a portion of Shannon's manager's deposition and part of Shannon's expert's deposition and report, doc. ## 173, 204, and Shannon's motion to strike some of the Laborers' summary judgment exhibits. Doc. # 180.[1]

## II. BACKGROUND[2]

### A. Overview

Plaintiffs are Mexican nationals who were recruited by defendants for seasonal agricultural work on defendants' muscadine grape farm in Screven County, Georgia. Doc. # 134 ¶ 2. Each

---

[1] For docket clearing purposes, the moot procedural motions for excess pages and an extension of time are granted. Doc. ## 169, 197.

[2] The Court culled these facts from the parties' statements of undisputed material fact. Doc. ## 130, 134, 153, 157. Citation to document 134 means that the defendants allege the fact in document 134, and the plaintiffs do not dispute that fact in document 157. Likewise citation to document 130 means that the plaintiffs allege the fact in document 130, and the defendants do not dispute the fact in document 153. The Court will highlight disputed facts as necessary.

In that regard, this Court applies the summary judgment principles explained in *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742-43 (11th Cir. 1996); *Cohen v. United American Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) and *Nizami v. Pfizer, Inc.*, 107 F.Supp.2d 791, 799 (E.D.Mich. 2000). Unrebutted, evidentially supported Fact Statements are deemed admitted under S.D.Ga.Loc. R. 56.1 and *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988).

year since 2000, Shannon has recruited guest workers from Mexico under the United States Department of Labor's ("DOL's") H-2A program. Doc. # 130 ¶¶ 1-8. That program authorizes employers to seek guest workers when there are not enough U.S. workers to fill the employer's needs. *Id.*

The H-2A program establishes minimum wages for such H-2A workers, and it also requires that employers pay certain transportation, food, and housing costs. These requirements are incorporated into "job orders" that describe the terms of the offered employment relationship; when accepted, that job order serves as a written contract between employer and employee. 20 C.F.R. § 655.102(b)(14). Apart from the H-2A program, the FLSA also applies to the employer-employee relationship that arises between farmer and laborer. 20 C.F.R. § 655.103(b).

Each year from 2000-2005, Shannon recruited between 62 (for 2000) and 90 (for 2003-2005) H-2A workers. Doc. # 130 ¶¶ 1-7. Plaintiffs were among those H-2A guest workers hired by Shannon during the grape-picking seasons -- mid-July through late October or early November of each year between 2000 and 2005. *Id.*

The Laborers bring a number of claims against Shannon. Those claims include: (1) failure to pay them FLSA-required minimum wages; (2) breach of job-order contracts that incorporated H-2A program requirements; (3) conversion; and (4) fraud. *See generally* doc. # 84. Given the voluminous filings and factual density of this action, the Court will first discuss the allegations and supporting/detracting facts for each claim separately, then reach the underlying issues.

### 1. *FLSA Violations*

For the 2002-2005 seasons, the Laborers claim three FLSA violations. First, they contend that they were not paid their minimum wage in the first pay period of each season. Doc. # 84 at 20-21 (Count I). The FLSA requires that employers pay a certain minimum wage, plus any expenses the employee incurs for the benefit of the employer. *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002). These are not two independent requirements; rather, the minimum hourly wage and the expenses are used to calculate a single FLSA lodestar. If an employer pays at a higher rate than the minimum hourly wage, it may not be required to reimburse expenses at all (*i.e.*, if the resulting pay [actual wage x hours worked] is higher than the FLSA lodestar [(minimum wage x hours worked) + expenses]). Certain pre-employment expenses -- *e.g.*, travel to the job site, immigration/visa expenses, etc. -- are treated as FLSA-qualified expenses during the first workweek. *Id.* Thus, where an employee's pay for the first workweek is less that the FLSA-required minimum wage per hour plus qualifying pre-employment expenses, the employer violates the FLSA. *Id.* The Laborers claim that Shannon failed to repay their expenses during the first pay period, and that as a result their pay for the first pay period of each season fell below the FLSA's minimum requirements.

The parties present facts about pre-employment visa/immigration, travel, and recruiting expenses. To secure an H-2A visa, and lawful immigration into the U.S., the Laborers had to travel to Monterrey, Mexico for an interview, stay overnight in Monterrey, pay a "visa reciprocity fee" to a Mexican bank, purchase a passport, purchase the H-2A visa itself, and pay an entry fee at the U.S. border.

Doc. # 130 ¶¶ 38-45 (doc. # 153 disputes only the amount of the costs). It is undisputed that Shannon did not reimburse visa/immigration expenses for the 2000-2004 seasons. Doc. # 130 ¶ 24. The Laborers claim that these expenses were reimbursed in the 2005 season, but deductions from their first paycheck nonetheless led to payment below minimum wage. Doc. # 130 ¶¶ 27-29. Shannon contests this assertion, noting that it tailored its 2005 deductions to ensure that the Laborers' first-week wages would not fall below the legal minimum. Doc. # 153 at 4-5.

As for transportation, it is undisputed that the Laborers paid their own transportation costs to get from Mexico to the Shannon's farm. Doc. # 130 ¶¶ 31-34 (doc. # 153 disputes only the costs of transportation for some Laborers). In addition, Shannon did not reimburse these transportation costs in the 2002 season's first week. *Id.* at ¶ 30.

The parties then discuss defendants' recruiting activities in Mexico. Doc. # 130 ¶¶ 35-37, 46-50. Apparently, the Laborers paid recruiting fees to individuals in Mexico, who would secure them H-2A jobs with Shannon. *Id.*; *but see* doc. # 153 ¶¶ 35-37, 46-50. Shannon recruited workers through both official recruiters (people paid and sent by Shannon to recruit)[3] and unofficial recruiters (the previous season's workers). Doc. # 130 ¶¶ 35-37, 46-50; *but see* doc. # 153 ¶¶ 35-37, 46-50. The Laborers' allege that "[a]ll workers ... paid recruitment fees." Doc. # 130 ¶ 49; *see* doc. # 153 ¶ 49.

In total, the Laborers each claim between $500

and $600 dollars in pre-employment fees, and contend that by failing to pay that amount to the Laborers during their first week at Shannon Farms, Shannon paid them less than the required minimum wage. Plaintiffs assert that in no season did Shannon reimburse them for these expenses during the first week. Doc. # 130 ¶¶ 55-70. Shannon agrees that for 2000-2002 it paid only travel expenses, and says it paid those expenses halfway through the season. Doc. # 130 ¶ 76; # 153 ¶ 76.

For the 2003 and 2004 seasons, however, Shannon points to checks dated 7/25/03[4] and 8/11/04 (dates near the beginning of the season) as proof that the expenses were paid the first week. Doc. # 153 ¶¶ 55-70. The Laborers say that the checks dated 7/25/03 and 8/11/04 were not actually given to them until late September of each season. Doc. # 130 ¶¶ 53-70; Doc. #153 ¶¶ 53-70.[5]

For the 2005 season the Laborers say that Shannon gave them a reimbursement check during the first week, but then deducted an amount equal to $2.92 per hour worked in the first pay period from the reimbursement. This resulted in below-minimum-wage pay, thus violating the FLSA. Doc. # 130 ¶¶ 71-72; doc. # 153 ¶¶ 71-72.

---

[4] Note that these are distinct from other reimbursement checks in the amount of $206 that Shannon admits were made out but never issued to the Laborers at all. Doc. # 130 ¶ 53; doc. # 153 ¶ 53 (Shannon is not sure what these other 7/25/03 checks were for; the checks were filled out but never issued to anyone).

[5] The related motions to strike the testimony of a Shannon manager (Ricardo Gaspar) and the factual contentions of the parties' experts about the accounting program "QuickBooks" are relevant to this factual dispute and are discussed further in Background subsections B-C, *infra.*

---

[3] Shannon claims that it authorized recruiting activities, and fees between $75 and $125, only by Marcos Rodriguez (2002-2003), Ricardo Gaspar (2003-2004), Rafael Jacame (2004-2005) and Carmen Contreras (2004-2005). Doc. # 128, exh. F at 4-5.

The Laborers next claim that Shannon violated the FLSA by "failing to pay each worker at least an average of the applicable minimum wage ($5.15) for every compensable hour of labor performed in a workweek, in violation of 29 U.S.C. § 206(b)." Doc. # 84 at 22 (Count II). Shannon allegedly paid a "piece rate" -- a fixed payment per box of grapes picked -- rather than an hourly rate. Farmers use piece-rate pay as an incentive for workers to pick more product. But, like all employers, for all payment methods, the resulting pay must meet the FLSA's minimum hourly wage rate.

Rather than determine at the end of a pay period whether a worker's "piece rate" pay exceeded the § 206(b)-required minimum wage for the hours worked, Shannon allegedly divided the piece rate pay by the minimum wage to determine the number of hours an individual would have had to work to achieve the same pay. Shannon then documented that number (or a lower number) as the worker's hours for the pay period. Shannon, the Laborers thus conclude, paid them a "piece rate" even where the resulting pay per hour was less than the legal minimum rate, then "cooked the books" to make it look like they were being paid the minimum hourly rate.[6]

Beyond those specific under-compensation tactics, Shannon also is alleged to have generally violated the FLSA's timely-payment requirement. Doc. # 84 ¶¶ 95-102 (no separate Count enumerated). The Laborers argue that their pay did not meet the FLSA's requirements because it was sporadic and because a combination of insufficient funds in Shannon's account and lack of access to third parties who

would negotiate the checks rendered the checks non-negotiable.

The parties agree that Shannon did not provide checks on a scheduled day each pay period (*i.e.*, there was no weekly or bi-weekly "pay day"). Doc. # 130 ¶ 112; *see* doc. # 153 ¶ 112 ("Defendants did not always issue checks on the same day in each pay period"). The parties also agree that the dates on paychecks were consistently earlier than the actual day the check was handed to the worker. Doc. # 130 at ¶ 113; *see* doc. # 153 ¶ 113 (disputing only materiality). Furthermore, the account on which Shannon's checks were drawn "was regularly overdrawn and consistently had a negative balance for the months of August, September, and October." Doc. # 130 at ¶ 114; *see* doc. # 153 ¶ 114 (disputing only materiality). Shannon's bank had cashed checks from the account in the past, even when the account ran a negative balance. Doc. # 134 ¶ 7.

### 2. *Breach of Contract*

On top of the above-detailed alleged statutory violations, the Laborers also allege several contract breaches. First, they contend that the above FLSA violations also violated their contracts with Shannon, because the contracts incorporated the FLSA and various H-2A standards. Doc. # 84 at 23-31 (Counts III, IV & V). It is worth noting that for these claims, unlike the FLSA, the minimum wage is not the FLSA standard ($5.15), but rather the H-2A standard, which is

a rate not less than the federal minimum wage, the prevailing wage rate in the area, or the "adverse effective wage rate" [(AEWR)] whichever is highest. *See* 20 C.F.R. § 655.102(b)(9). The [AEWR] is the minimum wage rate that DOL

---

[6] As with the factual disputes surrounding reimbursement accounting, *supra*, the dispute about Shannon's bookkeeping as it related to the Laborers' wages is discussed in Background subsections B-C, *infra*.

determines is necessary to ensure that wages of similarly situated domestic workers will not be adversely affected by the employment of H-2A workers. *See id.* §§ 655.100(b), 655.107.

*Arriaga*, 305 F.3d at 1233. Because the statute of limitations for contract claims is longer than the statute of limitations for FLSA claims, the Laborers advance these claims back to the year 2000. *See* doc. # 31 at 3-4 (Order denying Shannon's motion to dismiss; applying six-year statute of limitations). These claims depend on the same wage/reimbursement facts as the FLSA claims, described above.

The Laborers also say that Shannon failed to pay their return-trip travel and subsistence expenses as required by their contracts. Doc. # 84 at 35-38 (Count VII). Both parties construe the contracts to require Shannon to pay for "transportation and subsistence from the place of employment to the place of recruitment." Doc. # 130 ¶ 128. In 2000-2004, Shannon paid for travel to Monterrey, Mexico, but not to the Laborers' home villages. *Id.* ¶ 130. Here, the "recruitment" dispute again becomes problematic, because Shannon claims it only "recruited" workers in Monterrey so it had a duty to return them only to Monterrey. Doc. # 130 ¶¶ 35-37, 46-50; *but see* doc. # 153 ¶¶ 35-37, 46-50. Thus, the Laborers' claims for the cost of getting from Monterrey to their home villages are improper because the contract only required payment for the return trip to Monterrey. Doc. # 153 ¶ 131. (Though Shannon argues that it paid for the costs of the trip between Monterrey and the workers' home villages in 2005, this does not rebut the Laborers' evidence for the other years, and it is irrelevant because the Laborers do not assert this claim for 2005. *Id.* ¶ 132.)

### 3. *Conversion*

The Laborers next claim that Shannon converted certain expense-reimbursement checks from the 2003 and 2004 seasons. Doc. # 84 at 38-40 (Count VIII). Specifically, they allege that in 2003 and 2004, Shannon Farms directed them to endorse and return checks they believed to be for reimbursing their travel expenses. Doc. # 130 ¶ 136. Shannon says that checks were prepared in some years to reflect the value of the travel expenses, but since Shannon bought the bus tickets directly, and paid cash for subsistence and additional transportation expenses, it thus was entitled to the returned checks. Doc. # 153 ¶ 136. Shannon claims the checks were blank when it gave them to the Laborers to sign. Doc. # 134 ¶ 9 (citing Laborer testimony that the checks were blank, doc. # 120 at 60-61; doc. # 118 at 39-40 ("It was a blank check")).

The Laborers dispute this contention, but point to no record evidence sufficient to create a genuine issue of fact, doc. # 157 ¶ 9B. On this point no rational jury could find anything other than that the checks were blank when distributed to the Laborers to sign.[7]

---

[7] The Laborers argue that a jury could find that the checks were not blank when presented because those very checks that are now in the record in fact are filled out to the workers for specific amounts. Doc. # 156 at 5 n.3, 6-7. Yet, the record also bears the Laborers' own admissions that the checks were blank when presented. Though a jury theoretically could draw a weak inference that, because the checks were filled out at a later date, they were filled out when presented to the Laborers, that weak inference is insufficient to rebut the Laborers' own admissions to the contrary.

### 4. *Fraud*

Finally, the Laborers claim that Shannon, Jr. and Shannon Farms ("Fraud Defendants") committed fraud by making intentional misrepresentations to the DOL to secure H-2A permits. Doc. # 84 at 40-45 (Count IX). The Laborers claim that the DOL relied on the Fraud Defendants' misrepresentations, and that they in turn relied on the DOL's endorsement to their detriment. The Fraud Defendants, say plaintiffs, represented to the DOL that they would pay the workers on a weekly or bi-weekly basis, that they would pay the required minimum hourly wage, and that they would pay for the reasonable costs of the Laborers' return transportation. But the defendants allegedly knew those promises were false and lacked then-present intent to perform them.

### B. Rodriguez and Gaspar Evidence

The Laborers presented a declaration from Marcos Rodriguez-Paramo, who traveled to Shannon Farms from 2000-2003. Doc. # 128, exh. Y at 1. Rodriguez was no ordinary H-2A laborer, but rather a computer scientist who came to help Shannon with its computer system. *Id.* at 2. He testified that he trained Shannon's manager, Ricardo Gaspar, to use Microsoft Excel -- a spreadsheet program -- and trained Gaspar and Cynthia Shannon to use the "QuickBooks" accounting program. *Id.* at 3; *see also* doc. # 114 at 92-94 (Cynthia Shannon testifying that she, Gaspar, Rodriguez, and possibly her daughter on occasion, wrote the checks on QuickBooks from 2000-2005). Rodriguez testified that he ran Excel to calculate worker pay, and in those calculations

> [t]he work hours of the packers was always calculated as a function of that which each worker cut or packed, that is to say, no start or ending time was ever recorded for the

pay calculation. In other words, we paid the workers by piecework, without concern for the time that they had worked.

*Id.* at 2.

Importantly, Rodriguez testified that he came up with a function in Excel, at Shannon, Jr.'s request, that calculated the number of hours work that would be required at the minimum pay rate to equal the earnings based on piecework, and then put the calculated number (as opposed to the actual hours worked) on the Laborers' paychecks. *Id.* at 3. In this way Shannon was able to pay workers the piece rate, even where it would violate the minimum hourly wage to do so, and cover its tracks. When the actual hours were input and the result was underpayment

> [w]e did not ... augment the pay, on the contrary, the number of hours worked was lowered, so that the numbers would balance with the guaranteed minimum. We never paid this difference in the years that I did the calculations from 2000 to September of 2003.

*Id.* at 5. According to Rodriguez, the data regarding actual hours worked on the "field sheets" or "tally sheets" was also falsified:

> Although there are hours noted on the "field" sheets each day, these were not the hours really worked. These hours were approximated in the office according to how many boxes the worker had done. I created a sheet each year that had an estimation of hours according to the boxes cut, to make the hours that appeared on the field tallies correspond. Ricardo asked me to do this, and that I teach him how to do it. The hours in these hours normally

were not written down in the "field," but rather in the office at the end of the day.

Rodriguez testified that he, Gaspar, and Shannon, Jr. all knew it was improper to calculate the hours in this fashion, so Shannon, Jr. told Rodriguez to hide the calculations by copying the data from one spreadsheet and using a function called "Paste Special" to place the data in a second spreadsheet without revealing the underlying calculations. *Id.* at 4. Rodriguez performed these calculations in the 2000, 2001, 2002, and 2003 seasons, and taught Gaspar to perform the calculations and use the "Paste Special" function. *Id.* Gaspar and Shannon, Jr. directly deny these assertions. Doc. # 154, exhs. R-S.

The Court is faced with statements directly contradicting one another: Rodriguez's statements describing how Shannon was cooking the books, doc. # 128, exh. Y, and Shannon, Jr.'s and Gaspar's statements denying any improper accounting. Doc. # 154, exhs. R-S. One crucial difference separates the statements, however. Whereas Rodriguez signed his statement on every page and declared under penalty of perjury that the statement was true, doc. # 128, exh. Y (each page in Spanish signed), Shannon, Jr. and Gaspar did not sign or swear to their statements. Doc. # 154, exh. R at 4, exh. S at 5.

Perhaps that was an oversight, or perhaps it was a lame attempt to evade perjury sanctions, should the testimony be proved false. If Gaspar and Shannon, Jr. can truthfully attest to the statements in document # 154, exhibits R and S, Shannon shall perfect the record by re-filing those exhibits, signed and sworn. If the exhibits are not re-filed within 10 days of the date this Order is served, the Court will *sua sponte* reconsider the portions of this Order that rely on those exhibits as evidence.

Finally, Rodriguez testified that in 2003, Shannon became aware of the requirement that inbound travel expenses be paid to the Laborers during the first week of the season (as opposed to midway through the season). Doc. # 128, exh. Y at 5-6. Rodriguez claims that to create the appearance of compliance while sparing Shannon the travel expenses money, they "put the date 7/25/03 as the date of the check, using QuickBooks, but in reality we created and printed the checks later ... we took some weeks." *Id.* at 6. "To make it appear that we were paying the other required part of the reimbursement [(visa/immigration expenses)]," Rodriguez said, "we obligated the workers to sign a check for the sum of $ 206 ... but the farm was never going to pay the workers for this check." *Id.*

The only rebuttal to this "reimbursement check" testimony are the same unsworn statements from Shannon, Jr. and Gaspar that "to the best of [their] knowledge" the 7/25/03 reimbursement checks were handed to the workers within a few days of 7/25/03. Doc. # 154, exh. R ¶ 10; *id.*, exh. S ¶ 12. Such "best of my knowledge" testimony does not meet the "personal knowledge" requirement of Rule 56(e), and thus is insufficient to create a genuine issue of material fact, even were the statements sworn. *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002).

Gaspar testified about the paycheck record keeping at his deposition, but only for the 2005 season (he did not use Excel before 2005, and it is unclear who kept the records in 2004, doc. # 116 at 26, 315-16). During examination by the Laborers' counsel, Gaspar testified to the same number-fudging that Rodriguez described -- calculating the number of hours a worker would need at minimum wage to equal his piece rate earnings, then using that number of hours (as

opposed to the actual hours worked) on the worker's pay stub. *Id.* at 317-18. After the examination, the parties took a break and Shannon's counsel prepped Gaspar for their own questioning. *Id.* at 440.

During Shannon's questioning, counsel asked Gaspar a series of questions about the same calculations and elicited testimony that the only reason the piece rate number of hours was calculated was to compare that number to the actual number of hours worked so Shannon could ensure it was paying the Laborers at the required higher rate. *Id.* at 440-43. During the questioning, counsel for the Laborers objected five times that the questions were leading. *Id.* On re-examination, Gaspar repeated the answers given to Shannon's counsel -- that the actual hours were accurately recorded and that a comparison was made between the actual hours and the calculated hours. *Id.* at 444-68.

## C. QuickBooks Experts

Shannon uses an accounting program called QuickBooks to manage employee payroll, including to print paychecks. Doc. # 130 at 56. QuickBooks not only allows the user to input a date for the face of a given check (the face date), but also keeps track of the last time a given check was modified within Quickbooks (the last-modified date). *See* doc. #128, exh. M at 5 (expert witness affidavit and report).[8] Shannon

---

says that it never altered checks in the system after they were printed. *E.g.*, doc. # 116 at 90-91 (Gaspar testimony: "Q. Okay. But you're 100% sure that you never modified the checks after you printed them? A. Right."); doc. # 114 at 170-71 (Cynthia Shannon testimony: "Q ... [O]nce you do the process of inputting the information into QuickBooks as we've discussed, would there be a reason to go back in and change that information once you've printed the check? A No. Q. No. And you don't ever do that? A. No. I don't have any reason to"). For paychecks, the face date and the last-modified date were typically the same -- checks were entered into the system using the current date as the face date and printed at the time of entry, causing the last-modified date to also be the current date (assuming the computer's internal clock was correct). Doc. # 153 ¶ 60.

The reimbursement checks Shannon allegedly gave the Laborers for their expenses in the first week of the 2004 season, however, have a face date of 8/11/04 (the date entered by the user) and a last-modified date of 9/28/04 (QuickBooks internal time-stamp of the last transaction). Doc. # 130 ¶ 57. The edit history of the checks has no entries prior to 9/28/04, but it is possible that the edit history was not enabled prior to 9/28/04. *Id.* ¶ 58. The check numbering and transaction numbers for the 8/11/04 checks are larger than other checks with face dates and last-modified dates of 9/14/04. *Id.* ¶ 59. Typically, check numbers and transaction numbers correlate to the actual order in which the checks were printed. *Id.* ¶ 64; *see* doc. # 153 ¶ 64 (disputing because occasionally checks are printed out-of-sequence).

From these undisputed facts, the Laborers' expert drew the disputed conclusion, buttressed by Laborer deposition testimony, that the "expenses" checks with a face date of 8/11/04

---

[8] Shannon objects to paragraphs 57-59 in document # 130 because it objects to the plaintiff's expert report (from which the facts were culled) and because it claims paragraph 59 is a "conclusion." Doc. # 153 ¶¶ 57-59. The MJ denied Shannon's objection to the expert report, doc. # 175, and this Court concludes that paragraphs 57-59 are simply facts about how QuickBooks works, not expert conclusions. Therefore, the facts attested to by the expert in his affidavit and report (doc. # 128, exh. M) are legitimate facts to use for summary judgment purposes.

were actually printed from QuickBooks on 9/28/04. Doc. # 130 ¶ 60; *see, e.g.,* doc. # 118 at 40-42 (Laborer testimony that 2003 and 2004 reimbursement checks were received in late September or early October). Shannon disputes this backdating conclusion and Laborer testimony by pointing to testimony from Gaspar and Cynthia Shannon that for payroll checks (not reimbursement checks) they generally input the date the check was prepared as the face date of the check, and give the checks to the workers within a few days thereafter. Doc. # 153 ¶ 60; doc. # 116 at 86-90; doc. # 114 at 171 (Cynthia Shannon: "The checks would have been made on the date that it says it was made, to the best of my knowledge").

Shannon is thus attempting to present the habit or routine practice with regard to *payroll checks* as F.R.Evid. 406 evidence with regard to the specific *reimbursement checks* at issue. The Court draws a distinction between the habit or routine practice testified to -- cutting *payroll* checks -- and the specific instance at issue, cutting *reimbursement* checks. Thus, the face date of the reimbursement checks -- an arbitrary date selected by the QuickBooks user -- is irrelevant to the question of when the checks were printed and distributed because Shannon did not establish a habit or routine practice of using the actual date as the face date for reimbursement checks.

Though the Court could view the testimony as evidence of the way Shannon used QuickBooks whenever any checks (reimbursement or payroll) were cut, it declines to do so. Nowhere in their testimony did Shannon, Jr., Gaspar, Cynthia Shannon, or anyone else deny that the checks with a face date of 8/11/04 were actually printed and given to the Laborers in late September or early October. Furthermore, the facts Shannon admits inexorably lead to the conclusion that

backdating occurred: Gaspar and Cynthia Shannon testified that they never amend a check entry after the check is printed, thus the last-modified date on any check would be the date the check was printed, and the last-modified date on the checks face-dated 8/11/04 was 9/28/04. Given the lack of a direct denial, and in light of the overwhelming evidence that the checks were backdated in the manner alleged, a rational jury could come to no other conclusion but that the practice was not denied because it could not truthfully be denied.

There thus is no genuine issue of fact that the checks face-dated 8/11/04 were printed and given to the workers in late September or early October 2004. Though Shannon would like to take a position without evidentiary support other than the user-selected face date on the check, that "position is so utterly discredited by the record that no reasonable jury could ... believe[]" it. *Scott v. Harris,* 550 U.S. ___, 127 S.Ct. 1769, 1776 (2007).

Seeking to avoid summary judgment on this point, Shannon introduced its own expert witness, who reported that

> [t]he Entered/Last Modified date contained in the QuickBooks file is not necessarily the date the check was entered. The check could have been entered prior to the date recorded in the Entered/Last Modified field.

Doc. # 202, exh. 8 at 6. Of course this is true; by both experts' explanation of Quickbooks's operation, if a check is entered and printed, then modified days later, the last-modified date will be later than the date the data was entered and the checks were printed. As explained above, however, this fact does not rebut the Laborers' evidence because Shannon's QuickBooks

operators, Gaspar and Cynthia Shannon, both admitted that they *never* edited checks after they entered the data and printed the checks. doc. # 116 at 90-91 (Gaspar testimony: "Q. Okay. But you're 100% sure that you never modified the checks after you printed them? A. Right."); doc. # 114 at 170-71 (Cynthia Shannon testimony: "Q ... [O]nce you do the process of inputting the information into QuickBooks as we've discussed, would there be a reason to go back in and change that information once you've printed the check? A. No. Q. No. And you don't ever do that? A. No. I don't have any reason to"). Thus, in this case, the last-modified date and the actual date the check was printed are the same.

But Shannon's expert went beyond QuickBooks, offering testimony regarding the Laborers' minimum-wage and damages calculations. Doc. # 202, exh. 8 at 7-12. The Laborers move to strike those sections of the report and limit the expert's future testimony to QuickBooks. Doc. # 204. The Court now turns to this and other motions of record.

## III. ANALYSIS

### A. Objection to Denial of Motion to Amend

The Laborers raise three FLSA claims. To be liable under the FLSA, a defendant must be an "employer" as that term is defined. Shannon, Sr. argues that he is not an FLSA "employer," and so summary judgment is due on the Laborers' FLSA claims against him. *See* doc. # 133 at 6-10. Blocking summary judgment to Shannon, Sr. on this issue, however, is his admission in ¶ 30 of Shannon's Answer that he in fact was an FLSA employer. Doc. # 84 ¶ 30 ("all times relevant to this action, Defendants Shannon Produce, Shannon, Sr., and Shannon, Jr. were employers as defined by the FLSA, 29 U.S.C. § 203(g)"); doc. # 85 ¶ 30 ("Defendants admit paragraph 30").

Thus, Shannon Sr. sought to amend the Answer to deny "employer" status. Doc. # 139. On 3/16/06, the MJ denied this motion, doc. # 167, and Shannon objected. Doc. # 182. To resolve Shannon, Sr.'s summary judgment argument the Court therefore must first adjudicate Shannon's objections to the MJ's Order denying the motion to amend.

Parties may object to matters decided by an MJ. S.D.GA.L.R. 72.2. Pursuant to Local Rule 72.2, Shannon challenged the MJ's 3/16/07 Order denying Shannon's motion to amend its Answer to raise the argument that Shannon, Sr. is not an "employer" as that term is defined in the FLSA. Doc. # 167 (MJ's Order); doc. # 182 (Shannon's Objection). The Court usually may only overrule portions of the MJ's Order "found to be clearly erroneous or contrary to law." S.D.Ga.L.R. 72.2. Where the motion is dispositive, however, the Court must make a *de novo* review. F.R.Civ.P. 72(b). Because the MJ's Order effectively eliminates Shannon, Sr.'s defense that he is not an FLSA "employer," the Court will apply the latter standard of review. *See Allendale Mut. Ins. Co. v. Rutherford*, 178 F.R.D. 1, 2 (D. Me. 1998).

The MJ's Order sets out the relevant procedural facts:

Plaintiffs filed their second amended complaint in this wage and payment action brought pursuant to the FLSA on August 17, 2006, and defendants filed their answer to this complaint on September 5, 2006. Docs. 84, 85. Defendants allege in the instant motion that they accidentally admitted that defendants James Shannon, Sr. and James Shannon, Jr. were statutory employers under the FLSA in their answer

10

to plaintiffs' second amended complaint. Doc. 139; *see* doc. 85 at ¶ 30. Defendants contend that plaintiffs should have known that this was a "clearly inadvertent admission" because defendants had denied that allegation in their original answer and later served a Rule 11 Notice to plaintiffs requesting that plaintiffs drop the FLSA charges against James Shannon, Sr. since he was not an statutory employer as defined by the FLSA. Doc. 140. Plaintiffs contend that allowing this "eleventh hour amendment" will cause undue delay and prejudice to them since defendants filed it following the close of discovery and after plaintiffs relied on that admission in their motion for partial summary judgment. Doc. 143.

Doc. # 167 at 2.

The MJ denied the motion because (1) the motion to amend came after the 12/18/05 deadline established by the Court's scheduling Order, so F.R.Civ.P. 16(b) "good cause" was necessary; (2) diligence is an essential element of good cause; and (3) the defendants were not diligent.

The Court finds Rule 16(b), and hence *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417 (11th Cir. 1998), relied on by the Laborers and the MJ, inapposite to the discussion. Plaintiffs, it must be remembered, moved for the second time to amend their Complaint on 7/31/06 -- eight months *after* the deadline for amending pleadings. The MJ found good cause and allowed that amendment. Doc. # 76. Fairness and consistency necessarily dictate that the deadline set in the pre-existing pretrial order was eliminated, yet the MJ nevertheless applied that pre-existing pretrial order deadline to deny Shannon a chance to amend its Answer. The MJ

should have applied the Rule 15(a) "freely amend" rationale to Shannon's motion to amend, rather than the Rule 16 "good cause" requirement.

Therefore, whether Shannon's motion to amend its Answer should be granted is controlled by Rule 15(a): amendments are allowed by "leave of court ... and leave shall be freely given when justice so requires." The Court has no trouble finding that the motion to amend should be granted. "[C]onsistent with Rule 15(a)'s mandate that 'leave shall be freely given when justice so requires,' district courts should generously allow amendments...." *Williams v. Bd. of Regents*, 477 F.3d 1282, 1292 n.6 (11th Cir. 2007).

The Court has discovery-supported briefs before it on the issue whether Shannon, Sr. is an FLSA employer. No additional discovery or briefing is required; the only difference between allowing and disallowing amendment is adjudicating the issue on the merits versus adjudicating the issue on a procedural technicality. This Court has a strong preference for adjudicating issues on the merits, rather than on technicalities. *Pattee v. Ga. Ports Auth.*, 477 F.Supp.2d 1272, 1275 (S.D. Ga. 2007). The Court therefore grants Shannon's objection, vacates the MJ's 3/16/07 Order denying Shannon's motion to amend, and grants Shannon's motion to amend to deny that Shannon, Sr. is an FLSA employer.

**B. Motion to Strike Gaspar Deposition**

The Laborers move to strike portions of Gaspar's deposition, as offered to oppose summary judgment, on the grounds that the deposition testimony was in response to leading questions -- questions to which the Laborers' contemporaneously objected. Doc. # 173.

F.R.Civ.P. 56(e) requires that when opposing summary judgment, a party must present "specific facts showing that there is a genuine issue for trial." To qualify under Rule 56(e), the opposition must consist of "such facts as would be admissible in evidence." Under F.R.Evid. 611(c), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." That Rule, however, affords courts discretion to tolerate leading questions. *U.S. v. Hewes*, 729 F.2d 1302, 1325 (11th Cir. 1984).

First, the Court will provide some context for the testimony in question. The Laborers seek to prove that Shannon systematically underpaid H-2A workers by using a piece rate when doing so resulted in pay below the minimum hourly wage. Part of the Laborers' proof is testimony from Gaspar and Rodriguez that Shannon, after figuring out the gross pay using a piece rate, calculated the number of hours that would be required at the minimum hourly wage to result in the same pay, then used that calculated figure as the number of hours worked on the H-2A workers' pay stubs. Gaspar testified, however, that Shannon calculated the hours for the innocent purpose of comparing that number of hours with the number of hours actually worked, and if the hours actually worked was higher, paying a "balance adjustment." Doc. # 117 at 448.

To decide this motion, the Court simply notes that Gaspar testified to the contested fact in response to non-leading questions in several places, including during the Laborers' redirect. *See* doc. # 116 at 448-49 (balance adjustment "[i]s when you made the comparison between the Column [hours actually worked] and Column [hours calculated], you will see the difference. And if he's missing time and if [hours calculated] shows less than [hours actually worked], I pay

the difference of that time"). The Laborers may believe that Gaspar's claim to have made these comparisons is false, but if it is, it is because Gaspar lied, not because Shannon's lawyers put words in his mouth. Therefore, the motion is granted in part -- the Court will ignore any of Gaspar's deposition responses to leading questions -- but denied insofar as it seeks to exclude testimony not in response to a leading question.

**C. Motion to Strike Portions of Shannon's Expert Report**

The Laborers also move to strike portions of Shannon's expert witness report. Doc. # 204. On 3/27/07, citing Shannon's myriad discovery abuses, this Court denied Shannon's motion to strike the plaintiffs' expert witness report. Doc. # 175 at 7-11. To avoid prejudice, however, the Court gave Shannon leave to file a supplemental response to the Laborers' motion for partial summary judgment, including "to retain their own expert if necessary." *Id.* at 10. Shannon retained its own expert, who offered an opinion counter to the Laborers' expert, but additionally challenged the Laborers' "AEWR Calculation" evidence and "Damage Calculations by Plaintiffs' Attorneys." Doc. # 202, exh. 8 at 6-11. The Laborers move to strike that expert's "conclusions drawn from those sections." Doc. # 204 at 1.

The Court can easily dispatch the minimum-wage calculation section -- "AEWR Calculation." An expert's testimony is only allowed where "scientific, technical, or other specialized knowledge will assist the trier of fact." F.R.Evid. 702. In the minimum-wage section, the expert merely conveys the fact that an H-2A employer can ensure minimum-wage compliance in two ways -- by comparing the minimum pay ("actual hours worked during the

pay period" x "minimum wage" = "minimum pay for the period") with the piece-rate pay the worker actually received, or by comparing the maximum hours ("piece-rate pay" / "minimum wage" = "maximum hours for the period") with the actual hours worked. Doc. # 202, exh. 8 at 7-8. This is merely logic, not expert testimony based on specialized knowledge, so that section of the expert report would not assist the trier of fact and therefore is stricken.

The second contested portion of Shannon's expert witness report, which attacks the Laborers' damage calculations, can be broken into several sections:

(1) the calculations are not in F.R.Civ.P. 26(a)(2)(B) expert opinion format, doc. # 202, exh. 8 at 7-8;

(2) the calculations include expenses the law does not require, id. at 8-9;

(3) the calculations do not include deductions from pay that the law allows and that Shannon made, id. at 8-10;

(4) the calculations include data that are not factually supported by the record, id. at 8, 11;

(5) the calculations include data that are assumed, where no assumption is legally proper, id. at 9-11.

All of these are legal arguments, not special knowledge or expert opinion that would be helpful to the jury, as required by Rule 702. Thus, this portion of Shannon's expert report also is stricken.

Clearly Shannon wants to attack perceived legal and factual flaws in the Laborers' wages and expenses calculations. But the proper way to do that is present legal arguments about the flaws in a motion to strike the exhibits that contain those flaws. Shannon has presented precisely those, and the Court will now address them.

## D. Motion to Strike the Laborers' Summary Judgment Exhibits

The Laborers present exhibits organizing their evidence in support of, inter alia, their pre-employment expenses each season (doc. # 128, exh. AA), their first-week minimum wages each season (id., exhs. BB-GG), their damages (id., exhs. HH-NN), their return travel expenses (id., exh. OO), the correlation between the hours calculated by Shannon and the hours Shannon reported actually worked (doc. # 170, exh. R-1 to R-4), specific instances of Shannon's failure to pay the required AEWR rate (id., R-7 to R-13), various Laborers' boxes of cut grapes picked per hour (id., R-14 to R-18), and inconsistencies between the hours recorded on Shannon's tally sheets and the hours recorded in Shannon's Excel files. Id., R-18. Shannon moves to strike these exhibits on the ground that the exhibits are full of opinions not proffered by an expert. Doc. # 180.

The motion is denied. The exhibits simply represent a guide to the Court to find what the Laborers consider the most relevant evidence in this case's gargantuan record. See F.R.Evid. 1006 ("The contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation"). Though the exhibits contain assumptions and arguments, the Court can treat those assumptions and arguments as legal analysis -- akin to reasoning in the Laborers' brief -- not as fact.

13

In addition, the portions of the exhibits that contain facts picked from Shannon's voluminous records can be treated as Rule 1006 evidence. Rule 1006 allows summaries of voluminous records to be presented as substantive evidence where the other party has had an opportunity to inspect the underlying records, and where those records would be admissible into evidence. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004). Here, the summary portions of the Laborers' exhibits are from Shannon's business records, so Shannon had an opportunity to inspect them, and the records themselves would be admissible under F.R.Evid. 803(6). Though the exhibits would likely not be allowed before a jury because the Laborers failed "to omit argumentative matter in their preparation," *Peat*, 378 F.3d at 1159, at the summary judgment stage this Court can separate facts from arguments. The Court will identify any facts it takes from the exhibits that are without other evidentiary support in the record.

## E.  Cross-Motions   for   Summary Judgment

"When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Muzzy Prods., Corp. v. Sullivan Indus., Inc.*, 194 F.Supp.2d 1360, 1378 (N.D. Ga. 2002) (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338-39 (Fed.Cir.2001)); *accord Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Thus, the Court will analyze each motion in turn.

### 1. *The Laborers' MSJ*

The Laborers move for partial summary judgment on five issues: (1) that all defendants are FLSA employers; (2) that Shannon violated the FLSA and breached the labor contracts because it failed to timely reimburse the Laborers for their pre-employment expenses, resulting in first week pay below the FLSA minimum wage requirement; (3) that Shannon violated the FLSA and breached the labor contracts because it used piece rate wages which resulted in a sub-minimum hourly wage; (4) that Shannon violated the FLSA by failing to timely pay the Laborers' wages, instead paying irregularly and with non-negotiable instruments; and (5) that Shannon breached the labor contracts each season by failing to pay return-trip expenses. Doc. # 128. The Court will discuss Shannon, Sr.'s status as part of the defendants' motion for summary judgment, and so proceeds first to whether summary judgment is due on Shannon's failure to timely reimburse pre-employment expenses.

### a. **Preemployment Expenses**

Under the FLSA,

> [e]mployers must provide workers' weekly wages "in cash or in facilities," "free and clear" of improper deductions, at a rate no lower than the minimum wage rate ($5.15 per hour since 1997). 29 U.S.C. § 206(a)(1); 29 C.F.R. §§ 531.35, 776.4.

*Arriaga*, 305 F.3d at 1235. "If an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose." *Id.* at 1237 (citing 29 C.F.R. § 531.35). An employer must calculate an FLSA lodestar each week equal to $5.15 per hour plus "primarily for the benefit of the employer" expenses, then pay that minimum each week. In the H-2A context, pre-employment spending by the migrant worker "primarily for the benefit of

the employer" is considered an expense during the first workweek. *Id.* Because of this, an H-2A employer must pay, at a minimum, the pre-employment expenses plus $5.15 per hour during the first week. *Id.* If the workers' total wages are less than the lodestar amount, the employer has violated the FLSA. *See also id.* at 1337 n. 11 (example illustrating these requirements).

In *Arriaga*, the Eleventh Circuit held that an H-2A workers' travel and visa/immigration costs are "primarily for the benefit of the employer," and thus must be reimbursed during the first workweek to avoid falling below the FLSA minimum wage rate. *Id.* at 1242-44. The court left open the question whether recruitment expenses are "primarily for the benefit of the employer," but held that agency principles must create employer liability for the recruiter's actions. *Id.* at 1244-45. "[T]he line is drawn based on whether the employment-related cost is a personal expense that would arise as a normal living expense." *Id.* at 1243. The Court holds that, at least for the Laborers in this case, recruiting fees would not arise as a normal living expense. Therefore an employer must timely reimburse pre-employment recruiting expenses where the recruiters are agents of the employer with actual or apparent authority to charge recruiting fees.

The Laborers raise first-week, FLSA claims for 2002-2005. It is undisputed that Shannon did not pay visa/immigration expenses from 2000-2004. Doc. # 130 ¶ 24. That, however, is insufficient to prove liability. To establish *Arriaga* first-week liability for 2002-2005, the plaintiffs must show (1) the first pay period gross pay actually received; (2) the first pay period hours actually worked; (3) the expenses "primarily for the benefit of the employer" incurred; and (4) other valid FLSA "wages" received during the first pay period and not

deducted from the gross pay, *see* 29 U.S.C. § 203(m) (wage paid include "reasonable cost ... to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees").[9] Only where the worker's actual pay (gross pay plus undeducted FLSA "wages") is less than the FLSA lodestar (minimum hourly wages plus expenses) has the employer violated the FLSA.[10] (The Court notes that reimbursement in the middle of the season for the expenses would not eliminate FLSA liability, but would reduce damages.)

The Laborers assert the same facts as a breach of contract claim. Doc. # 84 at 23-27 (Count III -- breach of contract based on first

---

[9] If an employer owes a minimum of $100 for a pay period under the FLSA, the employer can pay that wage in part using money and in part providing lodging, food, etc. Thus, total monetary payment before deductions ("gross pay") might be only $75 for the pay period, but as long as the employer provides $25 worth of lodging, food, or other 29 U.S.C. § 203(m) "wages," the FLSA will not be violated (because the total FLSA wages will be $100). Many employers, however, deduct the expenses of providing § 203(m) "wages" from the employee's gross pay. So, for instance, if a worker receives $25 in § 203(m) wages, many employers nullify those wages by deducting the $25 from the employee's gross pay, resulting in lower, post-deduction pay ("net pay"). In that situation, the worker would receive $75 in gross pay, and $25 in § 203(m) wages; with a $25 deduction from gross pay, however, the employee's FLSA wages remains at $75 [$75 + $25 - $25]. The FLSA wages can be defined in two ways when taking into account these deductions: [net pay (gross pay - deductions) + § 203(m) "wages"] or [gross pay + undeducted § 203(m) wages (those § 203(m) wages the employer gave the employee, but did not deduct from gross pay)]. The Court uses the latter here.

[10] The formula, using evidentiary elements (1) through (4) above, becomes: [(1) + (4) or actual pay] - [(2) x $5.15 + (3) or the FLSA lodestar]. If the result is negative, the employer violated the FLSA. *See* App. I.

week failure to pay FLSA because of unreimbursed inbound travel expenses); at 31-35 (Count V -- breach of contract based on contract term requiring inbound travel expense reimbursement at 50% point of the contract). The contracts required Shannon to comply with federal law, 20 C.F.R. § 655.103(b), and specifically stated that pre-employment expenses need not be paid until mid-way through the season, 20 C.F.R. §§ 655.102(b)(5)(i), 655.202(b)(5)(i). "[U]nder general rules of contract construction, a limited or specific provision will prevail over one that is more broadly inclusive." *Schwartz v. Harris Waste Mgmt. Group, Inc.*, 237 Ga.App. 656, 660 (1999).

Thus, in this instance the specific provision of the contract allowing Shannon to wait until the midpoint of the season to reimburse pre-employment expenses trumps the general provision requiring Shannon to comply with federal law (which requires Shannon to reimburse pre-employment expenses, to the extent that the reimbursement raises workers' wages above the minimum wage, during the first week). Therefore, the Laborers' have no breach of contract claim for the failure to pay pre-employment expenses during the first week, so summary judgment is due to Shannon on Count III.

On the other hand, Shannon admits that it did not reimburse visa and immigration expenses, at the mid-way point or otherwise, as required by law in the 2000-2004 seasons. Doc. # 130 ¶ 24. Summary judgment is thus due, on the issue of liability to the Laborers, on Count V.[11] In

subsection (iii), *infra*, the Court sets forth damages established, as well as what damages are available for the Laborers to prove.

The FLSA pre-employment expenses claim (Count I) remains. The Court will now discuss the issues that must be resolved to determine FLSA liability on this claim. As discussed above, the Court must determine four values.

### i. First Pay Period Actual Pay

There is no genuine issue of material fact that Shannon did not pay any reimbursement during the first week for 2000-2004 pre-employment expenses. *See* Part II(B) *supra* (unrebutted testimony from Rodriguez that 2003 reimbursement checks were backdated); Part II(C) (undisputed facts about the operation of QuickBooks, coupled with Gaspar and Cynthia Shannon admissions, lead to the inescapable conclusion that 2004 reimbursement checks were backdated). Thus, the Laborers' pay for the first pay period is solely what was provided for on their first paycheck. The Laborers' exhibits contain Rule 1006 summary evidence of the *net* pay for the 2000-2005 pay period. Doc. # 128, exhs. BB-GG.

To adjudicate the Laborers' motion for summary judgment, however, the Court requires evidence of the gross pay that the Laborers received the first week (value (1), above) and what other FLSA "wages" were paid and not deducted from the gross pay (value (4), above). Without knowing the precise deductions made from gross pay to arrive at "net" pay, the Court

---

[11] Though Shannon and the Laborers did not specifically move for summary judgment on Counts III and V, the comprehensive nature of the record, the exhaustive arguments raised by both parties, and the similarity of Counts I, III, and V make the Court confident that each party had adequate notice that such judgments could be forthcoming. To the extent that parties claim no notice and have additional arguments to advance on Counts III and V, the parties may file F.R.Civ.P. 59(e) motions to reconsider.

cannot determine the Laborers' first week actual compensation ((1) gross pay + (4) other, non-deducted FLSA "wages").

## ii. FIRST PAY PERIOD HOURS

The Laborers present summaries of the hours worked, as contained on Shannon's 2002-2005 tally sheets. Doc. # 128, exhs. DD-GG. The Court accepts the columns, which describe the hours worked in the first pay period, as a Rule 1006 summary of the relevant data on Shannon's tally sheets.

## iii. PRE-EMPLOYMENT EXPENSES

The Laborers present pre-employment expenses in the form of Mexican bank ("Banamex") fees, passport costs, visa fees, recruiting fees, bus fare to Monterrey, subsistence on the trip to Monterrey, hotel costs in Monterrey (2002-2005), bus fare from Monterrey to Shannon's Farm, subsistence from Monterrey to the Farm, and an INS fee for entrance into the U.S.A. Doc. # 128, exh. AA.

The following portions of the chart find support in the record (nothing in the chart summarizes voluminous records):

● $120-$150 bus fare from Monterrey, Mexico to Shannon Farms in Sylvania, Georgia. Doc. # 130 ¶ 134; # 153 ¶ 134. The facts are not clear as to when the fare was $120 as opposed to $150, so taking the evidence in the light most favorable to Shannon, the Court will treat each fare as $120.

● Travel expenses ($35 bus) from San Luis Potosi to Monterrey (doc. # 128, exh. G ¶¶ 22-25 (affidavit of Morales-Arcadio establishing all workers from San Luis

Potosi paid same charges "to catch the same private van" and "a bus to Monterrey together"); id., exh. H, ¶¶ 14-18 (similar testimony from Hernandez-Natividad)); and from Michoacan to Monterrey, id., exh. J, ¶ 28. No support exists for the listed bus fares from other states to Monterrey. See generally id., exh. AA.

● Hotel fees in Monterrey. Id., exh. G, ¶¶ 32-34 (testifying about hotel fees for himself, and that other workers paid the same fees).

● Banamex fees ($45 in 2000, $100 in 2001-2005). Doc. # 130 ¶¶ 40-41; # 153 ¶¶ 40-41.

● $100 H-2A visa fee. Doc. # 130 ¶ 44; # 153 ¶ 44.

● $6 border fee. Doc. # 130 ¶ 45; # 153 ¶ 45.

Other portions of the chart either find no support (factually or legally), or are contested such that a genuine issue of material fact remains. Plaintiffs claim $35 passport fees for each individual for each year. As a legal matter, the expense to obtain a passport for the work season is for the benefit of the employer. "[T]he line is drawn based on whether the employment-related cost is a personal expense that would arise as a normal living expense." Arriaga, 305 F.3d at 1243. Here, the Court holds that obtaining a passport is not a normal living expense for immigrant-laborers; rather, it is a necessity for their employment as immigrant-laborers.

As a factual matter, however, the $35 generalization for passport fees is problematic. Though some workers paid $35 fees for each

season, others paid $80-$100 once for a five-year renewal. *Compare* doc. # 128, exh. G ¶ 17 (five-year renewal); *id.*, exh. H ¶ 21 (same), *with id.*, exh. J ¶ 17 (one-year, $35 fee). Therefore, other than for Laborers from Michoacan, Mexico, who Rubio-Rubio testified paid the $35 fee each year, the passport fees are not clear. *Id.*, exh. J ¶ 17 (Laborers from Michoacan paid one-year, $35 renewal fee each year).

Furthermore, as to recruiting fees, Shannon admits that agent-recruiters charged some workers $100, but contests that all workers paid this $100 to Shannon-authorized recruiters. Doc. # 153 at ¶ 9. In other words, Shannon admits that many Laborers paid the fee to Shannon agents (thus, Shannon was liable to repay those fees during the first work week), but other Laborers paid fees to recruiters not authorized by Shannon.

Thus, the parties must sort out which workers paid fees to "Shannon authorized" recruiters -- Marcos Rodriguez (2002-2003), Ricardo Gaspar (2003-2004), Rafael Jacame (2004-2005) and Carmen Contreras (2004-2005), doc. # 128, exh. F at 4-5. -- and whether the recruiters to whom the other Laborers paid fees had "actual authority" or "apparent authority" from Shannon, as required by *Arriaga*. 305 F.3d at 1244-46.

Finally, the Court refuses to hold that money paid for meals while on the road was "primarily for the benefit of the employer." 29 C.F.R. § 531.32(c) ("meals are always regarded as primarily for the benefit and convenience of the employee"). Therefore, the Court establishes the following as pre-employment expenses Shannon was required by the FLSA to reimburse, subject to increase if the Laborers' can prove recruitment fees, passport fees, or other local bus fees:

**2002-2005**

- Michoacan = $425 ($100 Banamex + $35 passport + $100 visa fee + $48 bus to Monterrey + $16 hotel fee + $120 bus to Georgia + $6 border fee)

- Morelos = $342 ($100 Banamex + $100 visa fee + $16 hotel fee + $120 bus to Georgia + $6 border fee)

- Puebla = $342 ($100 Banamex + $100 visa fee + $16 hotel fee + $120 bus to Georgia + $6 border fee)

- San Luis Potosi = $377 ($100 Banamex + $100 visa fee + $35 bus to Monterrey + $16 hotel fee + $120 bus to Georgia + $6 border fee)

- Veracruz = $342 ($100 Banamex + $100 visa fee + $16 hotel fee + $120 bus to Georgia + $6 border fee)

- Hidalgo = $342 ($100 Banamex + $100 visa fee + $16 hotel fee + $120 bus to Georgia + $6 border fee)

### iv. OTHER FLSA "WAGES"

Though the Court notes evidence that Shannon compensated the Laborers by "furnishing ... board, lodging, or other facilities," 29 U.S.C. § 203(m), it is not clear whether these wages were deducted from gross pay, and it is not clear whether the Laborers took these additional wages into account when calculating the "net pay." *See* Part III(E)(1)(a)(i), *supra*.

Because the Laborers have not sufficiently established the data necessary to determine whether Shannon violated the FLSA for the first pay period, their summary judgment motion must be denied. Specifically, it is unclear how

the "net pay" evidence presented relates to gross pay and to wages under FLSA § 203(m). The Court is providing the parties a worksheet, attached as Appendix I, to illustrate the missing data.

### b. FLSA/Contract Minimum Wage

The Laborers next move for summary judgment on their claims that Shannon violated the FLSA and their labor contracts by paying the Laborers a piece rate even where such payments were less than the required minimum hourly wage ($5.15/hour for FLSA; AEWR for contract claims). To establish liability for these claims for a given pay period, a plaintiff must show: (1) the pay period gross pay actually received; (2) other valid FLSA "wages" received during the pay period that were not deducted from the gross pay; and (3) the pay period hours actually worked. Only where the actual compensation ((1) gross pay + (2) other, non-deducted FLSA "wages") is less than $5.15 multiplied by the hours worked is the FLSA violated. Similarly, the labor contracts are only breached where the actual compensation ((1) gross pay + (2) other, non-deducted FLSA "wages") is less than the season's AEWR multiplied by the hours worked.

This issue is not ripe for summary judgment because of a factual dispute regarding the number of hours worked. The Laborers present testimonial evidence of long workdays, see doc. # 128, exh. S; Shannon presents pay stubs showing shorter workdays. The crux of the issue at summary judgment is the evidentiary value of these exhibits.

Contrary to Shannon's arguments, testimony from a Laborer that he typically worked a certain amount of hours during a given month in a given season, and that other Laborers typically worked the same amount of hours, is evidence sufficient to establish the number of hours for a wide number of workdays for a large number of workers. Were the Court to require what Shannon claims is necessary -- specific testimony from each Laborer regarding the number of hours worked on each particular day relevant to their claims -- the record in this case would be infinite and testimony at trial would be interminable. The Laborer testimony summarized by exhibit S to document # 128 is sufficient to establish the long work days the Laborers allege across the days of a month and across all workers. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946) (establishing burden-shifting framework for proving specifics in FLSA minimum-wage claims), *superseded in part on other grounds*, 29 U.S.C. §§ 251-262 (Portal to Portal Act); *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1577-78 (11th Cir. 1985) (applying and extending *Anderson* framework), *modified by* 776 F.2d 265.

In *Anderson*, the Supreme Court held that "where the employer's records are *inaccurate or inadequate* and the employee cannot offer convincing substitutes ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687 (emphasis added). Here, the Laborers present ample evidence that Shannon's records with regard to hours worked are inaccurate. *E.g.*, doc. # 128, exh. Y (Rodriguez testimony that the hours shown on the tally sheets and pay stubs were *calculated* to create the illusion of minimum-wage compliance, not *recorded* to ensure compliance). Thus, absent evidence to the contrary, there would be no genuine issue of material fact that the records are inaccurate,

allowing the Laborers to establish their hours worked under *Anderson*'s relaxed standard.

But contrary to the Laborers' arguments, Shannon in fact has presented rebuttal evidence that the records (tally sheets and pay stubs) are accurate. Gaspar and Shannon, Jr. directly denied Rodriguez's assertions and claimed that the number of hours actually worked by each worker was properly recorded on tally sheets and pay stubs, and each worker was paid the minimum hourly wage where that would result in greater pay than piece rate pay. *See generally*, doc. # 154, exhs. R-S.[12] These statements suffice to create a jury issue on whether the records were accurate.

Thus, the central genuine issue of material fact preventing summary judgment for the Laborers' on their FLSA/contract minimum wage claims is whether Shannon's records of Laborer hours are inaccurate. If a jury finds that the records are inaccurate, it can then determine the number of hours actually worked by just and reasonable inference from the Laborer testimony summarized in document # 128, exh. S. The Court is providing the parties a worksheet, attached as Appendix II, to illustrate the required data.

### c. Failure to Timely Pay

The Supreme Court implicitly held that an employer violates the FLSA where it "ret[ains] the workman's pay." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). In other words, where the employer makes proper payment, but is late with that payment, the employer violates the FLSA. *See* Craig Becker,

---

[12] Unless Shannon can perfect these documents in the record as discussed in Part II(B), *supra* at 7, the Court will *sua sponte* reconsider this portion of the Order.

*The Check is in the Mail: Timely Payment Under the Fair Labor Standards Act*, 40 UCLA L. Rev. 1241, 1255 (1993) ("It seems quite apparent that [*Brooklyn Savings*'s] holding rested on the premise that Congress intended for workers to be compensated when their employers delay payment of mandated wages"). "[D]ouble payment must be made in the event of delay" because the worker's damages are "too obscure and difficult of proof for estimate other than by [such] liquidated damages." *Brooklyn Sav.*, 324 U.S. at 707; *see also* 29 U.S.C. § 216(b) (damages under the FLSA equal the "unpaid minimum wages ... and in an additional equal amount as liquidated damages").

Left unanswered in *Brooklyn Savings* -- a case in which the delay in payment was over two years, *id.* at 700 -- is how much of a delay suffices to make wages "unpaid" and therefore create FLSA liquidated-damages liability. When Congress enacted a minimum wage requirement in 29 U.S.C. § 206(a), which *Brooklyn Savings* suggests requires a *timely* minimum wage payment, did it intend that an employer would need to pay double that wage any time "pay is 'sporadic' or 'inconsistent'" as the Laborers argue? Doc. # 129 at 26.

In *Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993), the court held that the "only logical point that wages become 'unpaid' is when they are not paid at the time work has been done, the minimum wage is due, and wages are ordinarily paid -- on payday." *Id.* at 1540. The court took language from the Eleventh Circuit's opinion in *Olson* -- language noting that the FLSA includes a requirement of "prompt payment" of minimum wages -- and held that the deadline for such prompt payment is on the employee's regularly scheduled payday. *Id.* at 1542 (citing *Olson*, 765 F.2d at 1578). The Ninth Circuit created a simple, bright-line, "prompt payment"

20

rule: "Paychecks are due on payday. After that, the minimum wage is 'unpaid.'" *Biggs*, 1 F.3d at 1544. This Court rejects the Ninth Circuit's opinion and draws a distinction between wages "delayed" and wages "unpaid."

For the reasons stated in Judge Trott's compelling dissent in *Biggs*, this Court holds that delayed payment only becomes "unpaid" (thus giving rise to FLSA liquidated damages under 29 U.S.C. § 216(b)) where payment is not "reasonably prompt under the totality of the circumstances in the particular case." *Biggs*, 1 F.3d at 1545 (Trott, J. dissenting) (quoting lower court's opinion in the case).

The Laborers assert two late-payment FLSA claims: (1) that Shannon established no set payday, instead sporadically distributing paychecks; and (2) when Shannon did distribute paychecks, the pay was still not timely because the checks could not be cashed. According to the Laborers (on their "sporadic payment" claim): "Defendants concede that they did not make timely payment, irregularly providing employees their checks." Doc. # 129 at 26. Under the FLSA, however, that is simply not enough to make wages "unpaid" and give rise to liquidated damages. Instead, the Laborers must show that for specific pay periods the defendant was not reasonably prompt in issuing pay for the work done that period.

The Laborers also assert that their pay was not actually received on the day paychecks were issued because the paychecks were non-negotiable. The FLSA requires payment "in cash or negotiable instrument payable at par." 29 C.F.R. § 531.27(a). For a writing to be a negotiable instrument under Article 3 of the Uniform Commercial Code,[13] it must be, *inter alia*, "payable on demand or at a definite time." UCC § 3-104(a)(2). Shannon does not argue that it could avoid the "prompt payment" requirement by distributing negotiable instruments promptly that guaranteed payment at a "definite time" three months in the future -- a proposition that this Court would surely reject. Therefore, the negotiability of the paychecks turns on whether they were "payable on demand."

Essentially, Shannon argues that it met the FLSA's requirements because it gave the Laborers checks promptly. But, the Laborers point out, Shannon had no money in the account from which the funds were drawn. In fact, they maintain, Shannon took the Laborers' identification at the beginning of the season so they could not cash Shannon's checks at third-party outlets. Too, Shannon would not cash the checks itself until one to two months after they were distributed. (Approximately 95% of the checks ended up being cashed by Shannon itself. Doc. # 130 ¶ 117).

The Laborers present evidence that they often demanded payment from Shannon but were rejected because of a lack of funds. *E.g.* doc. # 152 at 52 ("Shannon company wouldn't cash the checks. They'd say they didn't have money"). Furthermore, the Laborers present evidence that the bank rejected demands for payment. *E.g.*, *id.* at 52-54 (worker presented check to be cashed at third-party store; teller took the check and momentarily left; teller returned and said the check could not be cashed because there

---

[13] Despite Shannon's arguments, Georgia law is inapplicable to the interpretation of federal statutes and regulations. Doc. # 152 at 38-39 (arguing that the paychecks were negotiable instruments under Georgia law so the FLSA's requirements were satisfied).

were no funds; from this a jury could draw the inference that the teller called the bank and the bank rejected the demand for payment). Shannon presents evidence that its bank honored checks drawn from Shannon's accounts, even when those accounts ran a negative balance. Doc. # 134 ¶ 7. But simply because the bank honored some checks in the past does not mean it would have paid each Laborer's check on demand each pay period, on an account with a substantial negative balance.

So, from this evidence, a jury could find that many of the checks were not "payable on demand." If a jury so finds, handing the checks to the workers would not satisfy the "prompt payment" requirement, and depending on the delay before the check was paid, a jury could find that Shannonn did not make "reasonably prompt payment" of the minimum wage for many pay periods.

The Court, however, notes that the 74 Laborers present this claim in six work seasons which contained around six pay periods each. Thus, as a rough estimate, the Laborers present 2,664 claims that Shannon failed to timely pay them because they did not present "cash or negotiable instrument" within a reasonably prompt time after the pay period was complete. Even if the deposition testimony presented proves that certain checks were not negotiable, inferences must be drawn for the non-moving party at the summary judgment stage, so the Court cannot generalize that Shannon failed to timely pay on the other 2,660-plus claims at issue. Therefore, the motion for summary judgment is denied; to find for the Laborers, a jury must draw vast inferences during deliberations that this Court may not during summary judgment.

### d. Statute of Limitations/Liquidated Damages

The Laborers request summary judgment on which statute of limitations should apply to their FLSA claims, and on the issue of FLSA liquidated damages. Doc. # 129 at 29-42. Willfulness drives the result here. *See* 29 U.S.C. § 255(a) (FLSA statute of limitations two years for standard violations, but three years for willful violations); 29 U.S.C. § 260 (affirmative defense against liquidated damages if employer acted in "good faith" and "with reasonable grounds for believing [he was not] violat[ing] the [FLSA]"). However, because the Laborers failed to meet the summary judgment standard for any FLSA violation, the Court need not address whether the alleged FLSA violations were willful.

### e. Breach of Contract for Failure to Pay Return Travel Expenses

The Laborers alleged that Shannon did not pay for subsistence on the return trip as required by their employment contracts. Doc. # 130 ¶ 134. Shannon does not dispute that subsistence payments were required; it simply claims that it gave the Laborers cash for their return-trip subsistence. Doc. # 153 ¶ 134. Therefore, there is a genuine issue of material fact foreclosing summary judgment for this portion of the return-travel claim.

The Laborers also argue that their employment contracts required Shannon to pay for their return trip from Shannon Farms to their home village; Shannon argues that the contracts required it to pay for return travel only to Monterrey, Mexico, and that the Laborers were responsible for their own trip home from there.

22

Under Georgia law,

> [i]nterpretation of a contract involves three steps. First, the court decides if the contract language is unambiguous, and if so the court enforces the contract's clear terms. Second, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity. And third, if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury.

*Caswell v. Anderson*, 241 Ga. App. 703, 705 (2000). Here, the contracts incorporate the H-2A regulations, which state that "the employer shall provide or pay for the worker's transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, came to work for the employer." 20 C.F.R. § 655.102(b)(5)(ii). What, then, is the place from which the worker, disregarding intervening employment, came to work for Shannon Farms?[14]

The Eleventh Circuit dealt with this issue in *Arriaga*. The court noted that the provision was ambiguous, that the rules of construction did not cure the ambiguity, and that therefore, under Florida law, the contract was to be construed against the farmer-drafters. *Arriaga*, 305 F.3d at 1246-48. The court in *Arriaga* held that the provision is ambiguous under Florida law because the Laborers could be deemed to have come from their home villages or from Monterrey. *Id.* at 1246. It is not clear that this reasoning is sufficient to create ambiguity under

Georgia law. "Ambiguity exists when a contract is uncertain of meaning, duplicitous, and indistinct; or when a word or phrase may be fairly understood in more than one way, such constitutes ambiguity." *Sheridan v. Crown Capital Corp.*, 251 Ga. App. 314, 315 (2001). It could be said that the provision is certain and can be understood in only one way; the Laborers came from both Monterrey and from their home villages, so Shannon was required to pay for their return trip to Monterrey and their home villages. Thus, the Court could hold that, unlike under Florida law, the contract is not ambiguous under Georgia law and it required Shannon to pay for the trip back to the workers' villages.

It turns out that the result is the same if the contract is deemed ambiguous. Under Georgia law, "construe against the drafter" is a rule of construction that can be deployed to eliminate the ambiguity.[15] *J & E Builders, Inc. v. R C Dev., Inc.*, ___ Ga. App. ___, 2007 WL 1266880 at *2 (5/2/2007) ("Even if the contract is ambiguous, any ambiguity would need to be resolved most strongly against the drafter of the contract"); *see Vass v. Gainesville Bank & Trust*, 224 Ga. App. 259, 261 (1997). Therefore, like in *Arriaga*, the contract provision must be construed to require subsistence and travel payment back to the Laborers' home villages, not just back to Monterrey.

The Laborers, however, are only entitled to partial summary judgment. To establish liability for the return-travel breach claim, the Laborers need only show that Shannon did not pay the necessary costs. It is undisputed that Shannon

---

[14] The Court is not clear why the parties believe the issue turns on where the Laborers were recruited; the relevant CFR section does not mention recruitment, nor did either party cite any source that equates the place of recruitment with the place from whence the Laborers came.

[15] This is slightly analytically different from Florida law, which applies the "construe against the drafter" rule only after the other rules of construction have failed to resolve an ambiguity. *Arriaga*, 305 F.3d at 1247-48.

paid no part of the trip from the point its bus dropped the Laborers off, to the Laborers' villages for 2000-2004. Thus, the Laborers are entitled to summary judgment on the issue of liability. As to damages, however, the Laborers' exhibit presenting return trip travel costs, doc. # 128, exh. OO, cites no admissible record evidence for the amounts alleged. Thus, there is a genuine issue of material fact as to the Laborers' damages. The Court is providing the parties a worksheet, attached as Appendix III, to illustrate the remaining required data.

### 2. *Shannon's MSJ*

Shannon moves for summary judgment on five issues: (1) that James Shannon, Sr. is not an "employer" under the FLSA and so is due summary judgment on Counts I and II; (2) Shannon is due summary judgment on the Laborers' conversion claim; (3) Shannon is due summary judgment on the Laborers' "untimely pay" claim; and (4) the Fraud Defendants are due summary judgment on the Laborers' fraud claim. Doc. # 132 at 2.

### a. **Shannon, Sr. as "Employer"**

Under the FLSA, an employee can bring an action "against any employer" for various claims involving wages and hours. 29 U.S.C. § 216(b). The term "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d). Shannon, Sr. claims that he is not an "employer," so no FLSA action can be maintained against him.

The defendant's status turns on whether the evidence establishes that "as a matter of economic reality [the employee] was dependent upon [the defendant]." *Patel v. Wargo*, 803 F.2d

632, 635 (11th Cir. 1986).[16] This question, in turn, depends on a series of individual factual inquiries. A defendant's status as an FLSA "employer" is thus a question of law with subsidiary findings of fact. *Id.* at 634 & n.1. The subsidiary findings of fact are made by "entertaining and assessing the evidence relevant to the inquiry called for by a given factor"; "the court is, in effect, conducting a miniature bench trial." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 & n.27 (11th Cir. 2003). Ultimately, the answers to individual inquiries are viewed together and the Court must determine, from those answers, whether the Laborers established Shannon, Sr.'s employment status by a preponderance of the evidence -- a question of law. *Id.* at 1209.

Therefore, the Court must start by answering the following:

(1) whether the agricultural employer has the power ... to direct, control, or supervise the worker or the work performed...;

(2) whether the agricultural employer has the power ... to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker....

*Id.* at 1208-09 (citing 29 C.F.R. § 500.20(h)(v)(iv)(A)-(G)); *Charles v. Burton*,

---

[16] *Patel* incorporated this test, originally created to determine whether an entity "employed" an individual, under 29 U.S.C. § 203(g). Thus, the *Patel* court made clear that, whether proceeding under the 29 U.S.C. § 203(g) definition of "employ" or under the 29 U.S.C. § 203(d) definition of "employer," the test is the same. Hence, the Court will cite cases discussing either 29 U.S.C. § 203(g) or § 203(d) in its analysis.

169 F.3d 1322, 1328 (11th Cir. 1999).[17] Courts also look to ownership in the employing company and whether the individual exercises significant control over the business's functions. *Cole Enters.*, 62 F.3d at 778; *see also Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 679 (1st Cir.1998) (managerial functions alone not enough; "[i]f ... the significant factor in the personal liability determination is simply the exercise of control by a corporate officer or corporate employee over the 'work situation,' almost any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees").

Shannon, Sr. owns 40% of Shannon Farms. Doc. # 134 ¶ 1. He is also listed as its Vice President, doc. # 130 ¶ 11, serves as the company's registered agent, doc. # 128, exh. A at 1-2, and co-signs or personally guarantees loans to Shannon Farms regularly, *id.* at 2. Shannon, however, presents evidence that Shannon, Sr. has not engaged in any substantial management functions for Shannon Farms since 2001. Doc. # 117 at 10-11 (Shannon, Sr. describing current role as solely "advisory"; sometimes goes to the fields but more often hunts and fishes); doc. # 119 at 29-30 (Shannon, Jr. describing father's status as "basically retired" for the last "[s]ix or seven years"; sole remaining duties are "a little tractor work every once in a while," and advising Shannon, Jr.).

The Laborers, on the other hand, present evidence that Shannon, Sr. performed significant day-to-day management functions. Doc. # 120 at 67 (Laborer testifying that Shannon, Jr. was "the boss" but that he worked with Shannon, Sr. for eight hours "one time"); doc. # 156, exh. P-1 (Laborer declaration that he worked primarily for Shannon, Sr., and describing variety of jobs he did under Shannon, Sr.'s supervision; most of the time he alone worked under Shannon, Sr., but occasionally other Laborers did as well); *id.*, exh P-2 (describing how Shannon, Sr. would often patrol the fields and report what he saw to Shannon, Jr. and Gaspar).

This evidence establishes that Shannon, Sr. (1) had the power to exercise control over the Laborers; but (2) had no power to hire and fire, make employment decisions, or determine wage rates and method of payment; (3) had substantial ownership in Shannon Farms (40%); but (4) did not exercise significant control over the businesses functions.

Based on these findings of fact, the court concludes that, as a matter of law, Shannon, Sr. was not an FLSA employer. Though he spent time in the fields with individual workers, the evidence creates the impression of a retiree undertaking ad hoc projects, not a businessman running his business. Moreover, the Laborers present nothing to rebut the deposition testimony that Shannon, Sr. is retired, and that Gaspar and Shannon, Jr. manage most of Shannon Farms's operations. While Shannon, Sr. is on the board and owns a significant portion of the company, he is a figurehead, not an employer. Therefore, he is due summary judgment on the Laborers' FLSA claims.

---

[17] These are the inquiries listed in *Martinez-Mendoza* relevant to the legal determination here: whether an individual officer of a company is an FLSA "employer." *See U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (using similar inquiries to determine whether shareholding president was an "employer" along with the corporation itself). Here the Court has omitted other *Martinez-Mendoza* inquiries that are irrelevant here, but were relevant to the question in that case: whether an agricultural employer that hires laborers through a contracting agency is a joint-employer with the contracting agency under the FLSA.

### b. Conversion Claim

Shannon next moves for summary judgment on Count VIII -- conversion of certain checks during the 2003 and 2004 seasons. Doc. # 133 at 10-15. "Conversion is the unauthorized assumption and exercise of the right of ownership over personal property belonging to another." *GLW Int'l Corp. v. Yao*, 243 Ga.App. 38, 42 (2000). "'The law applicable to conversion of personal property applies to instruments.' OCGA § 11-3-420(a). Checks are one form of instrument included in this provision. OCGA § 11-3-104(c), (f)." *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 276 Ga. 817, 820 (2003). The damages for such a conversion comprise the value of the intangible rights merged into the document. *Id.* at 820 n.7 (quoting RESTATEMENT (SECOND) OF TORTS § 242 (1965)).

Shannon argues that because the checks were blank, they were valueless, so there would be no damage from converting the checks. The Court agrees. A check or other negotiable instrument can be converted because, legally speaking, it is more than a piece of paper; it is a vessel carrying intangible rights. *Id.* A blank check, on the other hand, is nothing but a piece of paper, conversion of which is insufficient to support a legal claim. *See* O.C.G.A. § 11-3-420(b) ("In an action [for conversion of a check] the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument"). Therefore, Shannon's motion for summary judgment on Count VIII is granted.

### c. Failure to Timely Pay Claim

As discussed in Part III(E)(1)(c), *supra*, Shannon distributed paychecks to the Laborers, but there is evidence that (1) it delayed issuing the paychecks, and (2) the paychecks were not payable on demand, and so did not satisfy the FLSA's requirements. If the Laborers prove either or both of these facts at trial, a jury could find that Shannon did not pay them reasonably promptly, and thus violated the FLSA. Therefore, Shannon's motion for summary judgment on these counts is denied.

### d. Fraud Claim

The Laborers claim: (1) that Shannon defrauded them by making false statements to the DOL to secure H-2A licenses; (2) that the DOL relied on those false statements to certify Shannon's bid for H-2A labor; and (3) that Laborers relied on the DOL's certification in deciding to work for Shannon.

> The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff. For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.

*Crawford v. Williams*, 258 Ga. 806, 806 (1989).

Because the DOL acted as a middle-man for the fraudulent inducement, this case is controlled by *Florida Rock & Tank Lines, Inc. v. Moore*, 258 Ga. 106 (1988). That case involved a gas station owner (Station owner), a gas delivery service (Deliverer), and the third-party gas distributor that hired the delivery service (Exxon). *Moore v. Florida Rock & Tank Lines, Inc.*, 183 Ga. App. 520, 520-21 (1987), *rev'd* 258 Ga. at 106 (citing lower court's opinion for the facts). Upon gas delivery, the Station owner would typically give the Deliverer a check

payable to Exxon. 183 Ga. App. at 521. On the occasion in question, the Station owner told the Deliverer that he did not have the check, but he would pay later for the gasoline if the Driver would deliver. *Id.* The Deliverer refused, so the Station owner then called Exxon, which authorized the gas distribution, and the Deliverer pumped full the stations tanks. *Id.* Unbeknownst to the Deliverer and Exxon, the Station owner had no intention of paying for the gas. *Id.*

The Georgia Court of Appeals stated that "[t]he evidence in this case clearly authorized findings that [the Station owner] had made representations regarding his future payment for the gasoline, that he had no present intent to make the future payment and knew that his representations were false, and that he had made the false representations with a deceitful intent and purpose." *Id.* at 521-22. The court held, however, that the Deliverer could not maintain a fraud action against the Station owner because there was "no evidence that [the Station owner] made his false representations to [the Deliverer]"; the Station owner, rather, made false representations to Exxon. *Id.* at 522.

The Supreme Court of Georgia reversed, holding that a fraud claim would stand "where (as in this case) A, having as his objective to defraud C, and knowing that C will rely upon B, fraudulently induces B to act in some manner on which C relies, and whereby A's purpose of defrauding C is accomplished." *Florida Rock*, 258 Ga. at 107. Thus, to show a third-party fraud claim in Georgia, the plaintiff must provide record evidence that (1) the defendant's objective was to defraud the plaintiff; (2) the defendant knew the plaintiff would rely on the third-party; (3) the defendant fraudulently induced the third-party to act (by (a) fraudulent representation, (b) scienter, and (c) intent to induce an act); (4) the

plaintiff relies on the third-party's act; and (5) the plaintiff is thereby damaged. *Id.*; *Crawford*, 258 Ga. at 806 (fraud requires damage to the plaintiff).

The Laborers' claim fails because they present no evidence that Shannon's purpose was to defraud the Laborers. The evidence proffered by the Laborers shows at most that Shannon intended to defraud the Government into allowing it to sidestep the traditional bar on hiring foreign labor. Doc. # 156 at 26-28. The Laborers point to the following evidence:

(1) the defendants employed the H-2A program to fill jobs they otherwise could not legally fill with Mexican Laborers, *id.* at 26;

(2) Shannon, Jr. testified that the purpose of making the allegedly false statements to the DOL was to tell them what Shannon planned on offering the guest workers, *id.*;

(3) the allegedly false statements were required to secure DOL approval for Shannon's proposed H-2A labor use, *id.* at 26-27.

This evidence does not suggest in any way that Shannon intended to alter the Laborers' behavior by making misrepresentations to the DOL. Though the Laborers' behavior may have been altered, the evidence only shows that Shannon's intent was to secure government approval for bringing in foreign laborers. There is insufficient legal tissue connecting Shannon's alleged fraudulent representations to the DOL to the Laborers' decision to migrate to Shannon's farm. Because the first element in the Laborers' third-party fraud claim is unsupported, summary judgment for Shannon is proper.

## IV. CONCLUSION

Accordingly, on the motions and Objections advanced by defendants Shannon Produce Farms, Inc., James Shannon, Sr., and James Shannon, Jr. (referred to here, collectively as the singular "Shannon"), as well as the motions filed by the Clemente Morales-Arcadio plaintiffs (the plaintiffs), the Court rules as follows:

(a) Shannon's Objection to the Magistrate Judge's 3/16/07 Order (doc. # 167) denying Shannon's motion to amend is *SUSTAINED*, and Shannon's motion to amend to deny Shannon, Sr.'s status as an FLSA employer, doc. # 139 is *GRANTED*.

(b) Plaintiffs' motion to strike (doc. # 173) portions of Richardo Ruben Gaspar's deposition is *GRANTED IN PART* and *DENIED IN PART*. Their motion to strike (doc. # 204) portions of Shannon's expert witness report is *GRANTED*.

(c) Shannon's motion to strike (doc. # 180) Plaintiffs' summary judgment exhibits is *DENIED*.

(d) Plaintiffs' motion for partial summary judgment (doc. # 128) is *GRANTED IN PART* and *DENIED IN PART* as follows:

• Count I: denied.
• Count II: denied.
• Count III: denied.
• Count IV: denied.
• Count V: granted as to liability.
• Count VII: granted as to liability.

(e) Shannon's motion for partial summary judgment (doc. # 132) is *GRANTED IN PART* and *DENIED IN PART* as follows:

• Count I: granted as to Shannon, Sr., otherwise denied.
• Count II: granted as to Shannon, Sr., otherwise denied.
• Count III: granted, Count III is dismissed with prejudice.
• Fair Labor Standards Act (FLSA) timely-pay claim (henceforth Count IV-A): granted as to Shannon, Sr., otherwise denied.
• Count VIII: granted, Count VIII is dismissed with prejudice.
• Count IX: granted, Count IX is dismissed with prejudice.

Plaintiffs' claims against James Shannon, Sr., are dismissed with prejudice, so he is dropped from this case; the caption is amended accordingly, and all further filings shall comply.

The following claims remain for jury trial:

Count I: FLSA claim for minimum wage during the first workweek of the 2002-2005 seasons against James Shannon, Jr. and Shannon Produce Farms, Inc. (Shannon Farms). *See* App. I.

Count II: FLSA claim for minimum wage for subsequent workweeks during the 2002-2005 seasons against Shannon, Jr. and Shannon Farms. *See* App. II.

Count IV: Breach of contract claim for failure to pay contract minimum wage against Shannon Farms. *See* App. II.

Count IV-A: FLSA claim for failure to reasonably promptly pay against Shannon, Jr. and Shannon Farms.

Count V: Breach of contract claim for failure to pay inbound travel expenses at 50% point for the 2000-2004 against Shannon Farms.

(Only the issue of damages remains.)

Count VII: Breach of contract claim for failure to pay return travel expenses against Shannon Farms. (Only the issue of damages remains.) *See* App. III.

Unless, within 10 days of the date this Order is served, Shannon files signed and sworn copies of document # 154, exhibits R-S, the Court will reconsider portions of this Order *sua sponte*. Finally, for docket clearing purposes, the moot procedural motions for excess pages and an extension of time are ***GRANTED***. Doc. ## 169, 197. This case is not closed, and motion # 209 is referred to the Magistrate Judge.

Within 45 days of the date this Order is served, the parties shall file a comprehensive joint pretrial order, and unless settlement is reached, trial shall be set for shortly thereafter.

This /8 day of July, 2007.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| Appendix I Court's 1st Week FLSA Minimum Wage Claim | (1) First Week Gross Pay | (2) First Week Actual Hours | (3) Pre-Employment Expenses (Home State) | (4) Other FLSA Wages not Deducted From Gross Pay | (1) + (4) - (((2) x $5.15) + (3)) [If negative, FLSA violation in that amount] |
|---|---|---|---|---|---|
| **2002** | | | | | |
| German Hernandez-Hernandez | ? | 67 | $377 (SLP) | ? | ? |
| Clemente Morales-Arcadio | ? | 96 | $377 (SLP) | ? | ? |
| Pablo Zamora-Angeles | ? | 78 | $377 (SLP) | ? | ? |
| Jose Marcial Reyes-Fuentes* | ? | 97.5 | $342 (PUE) | ? | ? |
| Nicolas Morales-Arcadio | ? | 43 | $377 (SLP) | ? | ? |
| **2003** | | | | | |
| Bernardino Francisco-Hernandez | ? | 15.75 | $342 (HID) | ? | ? |
| Benito Hernandez-Cristobal | ? | 18.5 | $342 (HID) | ? | ? |
| Eusebio Hernandez-Hernandez | ? | 20 | $377 (SLP) | ? | ? |
| Jose Marcial Reyes-Fuentes | ? | 52 | $342 (PUE) | ? | ? |
| Evaristo Hernandez-Natividad | ? | 15.75 | $377 (SLP) | ? | ? |
| Alvaro Rubio-Arcadio | ? | 17.5 | $377 (SLP) | ? | ? |
| Pedro Rubio-Arcadio | ? | 28.25 | $342 (HID) | ? | ? |
| German Hernandez-Hernandez | ? | 22.25 | $377 (SLP) | ? | ? |
| Clemente Morales-Arcadio | ? | 24.5 | $377 (SLP) | ? | ? |
| Pablo Zamora-Angeles | ? | 17 | $377 (SLP) | ? | ? |
| Nicolas Morales-Arcadio | ? | 22.75 | $377 (SLP) | ? | ? |
| Jose Rosalino Antonio-Candelaria | ? | 22.75 | $377 (SLP) | ? | ? |
| **2004** | | | | | |
| Bernardino Francisco-Hernandez | ? | 44.64 | $342 (HID) | ? | ? |
| Benito Hernandez-Cristobal | ? | 59.39 | $342 (HID) | ? | ? |
| Eusebio Hernandez-Hernandez | ? | 55.96 | $377 (SLP) | ? | ? |
| Jose Marcial Reyes-Fuentes | ? | 54.44 | $342 (PUE) | ? | ? |
| Evaristo Hernandez-Natividad | ? | 51.4 | $377 (SLP) | ? | ? |
| Alvaro Rubio-Arcadio | ? | 49.49 | $377 (SLP) | ? | ? |
| Pedro Rubio-Arcadio | ? | 55.96 | $342 (HID) | ? | ? |
| German Hernandez-Hernandez | ? | 53.68 | $377 (SLP) | ? | ? |
| Clemente Morales-Arcadio | ? | 72.34 | $377 (SLP) | ? | ? |
| Juan Carlos Flores-Medina | ? | 62.15 | $342 (VER) | ? | ? |
| Roque Sanchez-Melchor | ? | 67.13 | $342 (VER) | ? | ? |
| Demetrio Santos-Ortiz | ? | 62.44 | $342 (VER) | ? | ? |
| Jose Rosalino Antonio-Candelaria | ? | 69.78 | $377 (SLP) | ? | ? |
| **2005** | | | | | |
| Jose Marcial Reyes-Fuentes | ? | 70.5 | $342 (PUE) | ? | ? |

* - Plaintiffs did not present Reyes-Fuentes as a 2002 claimant in their complaint, but the Court will treat their argument, and Shannon's failure to object, as an F.R.Civ.P. 15(b) constructive amendment.

Home State Key: SLP = San Luis Potosi; PUE = Puebla; HID = Hidalgo; VER = Veracruz

| Appendix II Count II/IV FLSA/Contract Wage Claims Pay Period: X/X/200X to X/X/200X | (1) Gross Pay | (2) Other FLSA Wages not Deducted From Gross Pay | (3) Actual Hours | ((1) + (2)) - ((3) x $5.15) [If negative, FLSA violation in that amount] | ((1) + (2)) - ((3) x AEWR) [If negative, contract violation in that amount] |
|---|---|---|---|---|---|
| Clemente Morales-Arcadio | | | | | |
| José Rosalino Antonio-Candelaria | | | | | |
| Juan Carlos Flores-Medina | | | | | |
| Bernardino Francis Co-Hernandez | | | | | |
| Benito Hernandez-Cristobal | | | | | |
| German Hernandez-Hernandez | | | | | |
| Eusebio Hernandez-Hernandez | | | | | |
| Evaristo Hernandez-Natividad | | | | | |
| Nicolas Morales-Arcadio | | | | | |
| José Marcial Reyes-Fuentes | | | | | |
| Alvaro Rubio-Arcadio | | | | | |
| Pedro Rubio-Arcadio | | | | | |
| Roque Sanchez-Melchor | | | | | |
| Demetrio Santos-Cruz | | | | | |
| Pablo Zamora-Angeles | | | | | |
| Emiliano Hernandez-Calzo | | | | | |
| Rafael Hernandez-Gonzalez | | | | | |
| Miguel Angel Hernandez-Maturino | | | | | |
| Celestino Jacome-Arguello | | | | | |
| Manuel Medina-Lopez | | | | | |
| Moises Meneses-Tellez | | | | | |
| Oscar Morales-Fernandez | | | | | |
| Marcelo Morquecho-Suarez | | | | | |
| Leonel Paredes-Jacome | | | | | |
| Gustavo Reyes-Camargo | | | | | |
| Javier Rubio-Martinez | | | | | |
| Gilberto Rubio-Rubio | | | | | |
| Imelda Rubio-Rubio | | | | | |
| Noe Rubio-Rubio | | | | | |
| Rigoberto Rubio-Rubio | | | | | |
| Jesus Santos-Quijano | | | | | |
| Doroteo Soto-Cervantes | | | | | |
| German Soto-Cervantes | | | | | |
| Nicolas Velazquez-Vazquez | | | | | |
| Martin Ballesteros-Torres | | | | | |
| Dejsy Barreto-Rodriguez | | | | | |
| Pedro Barrera-Rubio | | | | | |
| Andrés Luz-Primitivo | | | | | |
| Oscar Rojasvazquez | | | | | |
| Manuel Soto-Cervantes | | | | | |
| Alvaro Zamudio-Suarez | | | | | |
| Fausto Zamudio-Suarez | | | | | |
| Filemon Rubio-Delgado | | | | | |
| Fray Tomas Elotlan-Munguiar | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Patricia Rodriguez-Paramo | | | | | |
| Serafin Rubio-Rubio | | | | | |
| Eusebio Sanchez-Rojas | | | | | |
| Antonio Tellez-Fuentes | | | | | |
| Carlos Aguilar-Cadena | | | | | |
| Hermilo Cano-Tellez | | | | | |
| Esequiel Torija-Velazquez | | | | | |
| Julio Torija-Velazquez | | | | | |
| Anselmo Rojas-Rojas | | | | | |
| Martin Tirzo-Vazquez | | | | | |
| Alejandro Tellez-Fuentes | | | | | |
| José Isabel Tirzo-Vazquez | | | | | |
| Gerardo Arreola-Zavala | | | | | |
| Aurelio Pedraza-Palacios | | | | | |
| Carlos Acevedo-Flores | | | | | |
| Salvador Duran-Hernandez | | | | | |
| Hipolito Virgen-Palacios | | | | | |
| Maximino Vallejo-Gonzalez | | | | | |
| Carlos Rubio-Ruiz | | | | | |
| Santos Victoriano Hernandez-Morales | | | | | |
| Guadalupe Rubio-Delgado | | | | | |
| Reyes Hernandez-Pasilla | | | | | |
| Porfirio Rodriguez-Gonzalez | | | | | |
| Antonio Rubio-Delgado | | | | | |
| Lidia Mejia-Mondragon | | | | | |
| Rene Carlos Lara-Suarez | | | | | |
| Nicolas Lara Delgado | | | | | |
| Mauricio Morquecho-Arriaga | | | | | |
| Bonifacio Rojas-Rojas | | | | | |
| Julio Morales-Hernandez | | | | | |

| Appendix III<br>Count VII<br>Reimbursement for Travel from<br>Shannon's Bus Workers'<br>Home Village | (1)<br>Central<br>Mexico to<br>Home<br>Village Bus<br>Costs | (2)<br>Subsistence<br>Costs from<br>Georgia to<br>Home Village | (3)<br>Central<br>Mexico to<br>Home Village<br>Bus Costs<br>Paid by<br>Shannon | (4)<br>Subsistence<br>Costs Paid<br>by Shannon | (1)+(2)-(3)-(4)<br>[if positive<br>contract<br>breach in that<br>amount] |
|---|---|---|---|---|---|
| **2000** | | | | | |
| Clemente Morales-Arcadio | | | 0 | | |
| Lidia Mejia-Mondragón | | | 0 | | |
| Esequiel Torija-Velazquez | | | 0 | | |
| Julio Torija-Velazquez | | | 0 | | |
| Alejandro Tellez-Fuentes | | | 0 | | |
| Mauricio Morquecho-Arriaga | | | 0 | | |
| Jose Marcial Reyes-Fuentes | | | 0 | | |
| **2001** | | | | | |
| Clemente Morales-Arcadio | | | 0 | | |
| Nicolás Morales-Arcadio | | | 0 | | |
| Jose Marcial Reyes-Fuentes | | | 0 | | |
| Pedro Rubio-Arcadio | | | 0 | | |
| Rafael Hernandez-Gonzalez | | | 0 | | |
| Javier Rubio-Martinez | | | 0 | | |
| Noé Rubio-Rubio | | | 0 | | |
| Rigoberto Rubio-Rubio | | | 0 | | |
| Doroteo Soto-Cervantes | | | 0 | | |
| Deisy Barreto-Rodriguez | | | 0 | | |
| Patricia Rodriguez-Paraino | | | 0 | | |
| Serafin Rubio-Rubio | | | 0 | | |
| Antonio Tellez-Fuentes | | | 0 | | |
| Carlos Aguilar-Cadena | | | 0 | | |
| Hermilo Caño-Tellez | | | 0 | | |
| Julio Torija-Velazquez | | | 0 | | |
| Anselmo Rojas-Rojas | | | 0 | | |
| Alejandro Tellez-Fuentes | | | 0 | | |
| Maximino Vallejo-Gonzalez | | | 0 | | |
| Santos Victoriano Hernandez-Morales | | | 0 | | |
| Lidia Mejia-Mondragon | | | 0 | | |
| Mauricio Morquecho-Arriaga | | | 0 | | |
| **2002** | | | | | |
| Clemente Morales-Arcadio | | | 0 | | |
| German Hernandez-Hernandez | | | 0 | | |
| Nicolás Morales-Arcadio | | | 0 | | |
| Jose Marcial Reyes-Fuentes | | | 0 | | |
| Pablo Zamora-Angeles | | | 0 | | |
| Miguel Angel Hernandez-Maturino | | | 0 | | |
| Moises Meneses-Tellez | | | 0 | | |
| Marcelo Morquecho-Suarez | | | 0 | | |
| Gustavo Reyes-Camargo | | | 0 | | |
| Javier Rubio-Martinez | | | 0 | | |
| Gilberto Rubio-Rubio | | | 0 | | |
| Noé Rubio-Rubio | | | 0 | | |

| | | | | |
|---|---|---|---|---|
| Rigoberto Rubio-Rubio | | | 0 | |
| Doroteo Soto-Cervantes | | | 0 | |
| Deisy Barreto-Rodriguez | | | 0 | |
| Filemon Rubio-Delgado | | | 0 | |
| Fray Tomas Elotlan-Munguia | | | 0 | |
| Patricia Rodriguez-Paramo | | | 0 | |
| Serafin Rubio-Rubio | | | 0 | |
| Eusebio Sanchez-Rojas | | | 0 | |
| Antonio Tellez-Fuentes | | | 0 | |
| Carlos Aguilar-Cadena | | | 0 | |
| Hermilo Caño-Tellez | | | 0 | |
| Julio Torija-Velazquez | | | 0 | |
| Anselmo Rojas-Rojas | | | 0 | |
| Alejandro Tellez-Fuentes | | | 0 | |
| Aurelio Pedraza-Palacios | | | 0 | |
| Carlos Acevedo-Flores | | | 0 | |
| Salvador Duran-Hernandez | | | 0 | |
| Maximino Vallejo-Gonzalez | | | 0 | |
| Carlos Rubio-Ruiz | | | 0 | |
| Guadalupe Rubio-Delgado | | | 0 | |
| Reyes Hernandez-Pasilla | | | 0 | |
| Porfirio Rodriguez-Gonzalez | | | 0 | |
| Antonio Rubio-Delgado | | | 0 | |
| Lidia Mejia-Mondragon | | | 0 | |
| **2003** | | | | |
| Clemente Morales-Arcadio | | | 0 | |
| Jose Rosalino Antonio-Candelaria | | | 0 | |
| Bernardino Francisco-Hernandez | | | 0 | |
| Benito Hernandez-Cristobal | | | 0 | |
| German Hernandez-Hernandez | | | 0 | |
| Eusebio Hernandez-Hernandez | | | 0 | |
| Evaristo Hernandez-Natividad | | | 0 | |
| Nicolas Morales-Arcadio | | | 0 | |
| Jose Marcial Reyes-Fuentes | | | 0 | |
| Alvaro Rubio-Arcadio | | | 0 | |
| Pedro Rubio-Arcadio | | | 0 | |
| Pablo Zamora-Angeles | | | 0 | |
| Miguel Angel Hernandez-Maturino | | | 0 | |
| Celestino Jacome-Arguello | | | 0 | |
| Moises Meneses-Tellez | | | 0 | |
| Gustavo Reyes-Camargo | | | 0 | |
| Javier Rubio-Martinez | | | 0 | |
| Gilberto Rubio-Rubio | | | 0 | |
| Imelda Rubio-Rubio | | | 0 | |
| Noe Rubio-Rubio | | | 0 | |
| Rigoberto Rubio-Rubio | | | 0 | |
| Doroteo Soto-Cervantes | | | 0 | |
| Filemon Rubio-Delgado | | | 0 | |
| Fray Tomas Elotlan-Munguia | | | 0 | |
| Serafin Rubio-Rubio | | | 0 | |
| Antonio Tellez-Fuentes | | | 0 | |

| | | | | |
|---|---|---|---|---|
| Carlos Aguilar-Cadena | | | 0 | |
| Hermilo Cano-Tellez | | | 0 | |
| Julio Torija-Velazquez | | | 0 | |
| Anselmo Rojas-Rojas | | | 0 | |
| Gerardo Arreola-Zavala | | | 0 | |
| Aurelio Pedraza-Palacios | | | 0 | |
| Salvador Duran-Hernandez | | | 0 | |
| Maximino Vallejo-Gonzalez | | | 0 | |
| Carlos Rubio-Ruiz | | | 0 | |
| Santos Victoriano Hernandez-Morales | | | 0 | |
| Guadalupe Rubio-Delgado | | | 0 | |
| Reyes Hernandez-Pasilla | | | 0 | |
| Antonio Rubio-Delgado | | | 0 | |
| Lidia Mejia-Mondragon | | | 0 | |
| Bonifacio Rojas-Rojas | | | 0 | |
| **2004** | | | | |
| Clemente Morales-Arcadio | | | 0 | |
| Jose Rosalino Antonio-Candelaria | | | 0 | |
| Bernardino Francisco-Hernandez | | | 0 | |
| Benito Hernandez-Cristobal | | | 0 | |
| German Hernandez-Hernandez | | | 0 | |
| Eusebio Hernandez-Hernandez | | | 0 | |
| Evaristo Hernandez-Natividad | | | 0 | |
| Jose Marcial Reyes-Fuentes | | | 0 | |
| Alvaro Rubio-Arcadio | | | 0 | |
| Pedro Rubio-Arcadio | | | 0 | |
| Demetrio Santos-Cruz | | | 0 | |
| Miguel Angel Hernandez-Maturino | | | 0 | |
| Celestino Jacome-Arguello | | | 0 | |
| Manuel Medina-Lopez | | | 0 | |
| Marcelo Morquecho-Suarez | | | 0 | |
| Leonel Paredes-Jacome | | | 0 | |
| Gustavo Reyes-Camargo | | | 0 | |
| Javier Rubio-Martinez | | | 0 | |
| Gilberto Rubio-Rubio | | | 0 | |
| Imelda Rubio-Rubio | | | 0 | |
| Noe Rubio-Rubio | | | 0 | |
| Rigoberto Rubio-Rubio | | | 0 | |
| Doroteo Soto-Cervantes | | | 0 | |
| German Soto-Cervantes | | | 0 | |
| Nicolas Velazquez-Vazquez | | | 0 | |
| Filemon Rubio-Delgado | | | 0 | |
| Serafin Rubio-Rubio | | | 0 | |
| Aurelio Pedraza-Palacios | | | 0 | |
| Salvador Duran-Hernandez | | | 0 | |
| Maximino Vallejo-Gonzalez | | | 0 | |
| Guadalupe Rubio-Delgado | | | 0 | |
| Antonio Rubio-Delgado | | | 0 | |
| Julio Morales-Hernandez | | | 0 | |